# UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI

MARK LUKEHART,

      Plaintiff,

vs.

NANCY A. BERRYHILL,
Deputy Commissioner for Operations,
Performing the duties and functions not
Reserved to the Commissioner
of Social Security,

      Defendant.

Case No. 5:17-CV-06140-NKL

## ORDER

Plaintiff Mark Lukehart seeks review of the denial of his application for Supplemental Security Income. For the reasons set forth below, the Court affirms the determination in part and reverses it in part.

### I. BACKGROUND

Mr. Lukehart filed an application for Supplemental Security Income on May 14, 2015, alleging an onset date of April 7, 2015. Tr. 216. He alleged disability due to osteoarthritis, chronic back pain, bulging discs in cervical spine, degenerative disc disease, arthralgia of both knees, arthralgia of both shoulders, and problems bending, twisting, standing, or sitting for long periods, as well as severe anxiety, bipolar disorder, and short- and long-term memory loss. Tr. 242.

Mr. Lukehart's application was denied on July 16, 2015. Tr. 152. Mr. Lukehart filed an appeal on August 21, 2015. Tr. 159. On August 26, 2016, Mr. Lukehart appeared and testified at a hearing before the administrative law judge ("ALJ"). Tr. 101-15.

On October 4, 2016, the ALJ issued an unfavorable decision. (Tr. at 7-23). Although the ALJ found that claimant had some severe impairments, namely, degenerative disc disease, osteoarthritis,

1

degenerative joint disease, and affective disorder, the ALJ found that Mr. Lukehart did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 416.920(d), 416.925, and 416.926). Tr. 12. The ALJ found that Mr. Lukehart had the residual functional capacity ("RFC") to perform sedentary work with the following limitations:

> can no more than occasionally lift, carry, push, or pull up to ten pounds; can no more than frequently lift, carry, push, or pull up to less than ten pounds; can sit for no more than six hours total in an eight-hour workday; can stand or walk for no more than two hours total in an eight-hour workday; can no more than occasionally climb ramps or stairs; can never climb ladders, ropes, or scaffolds; can no more than frequently balance; can no more than occasionally stoop, kneel, crouch, or crawl; must avoid concentrated exposure to hazards; limited to simple, routine work; can never have interaction with the public; can have no more than occasional interaction with co-workers and supervisors; and can no more than occasionally reach overhead bilaterally.

Tr. 14. Based on testimony from a vocational expert ("VE"), the ALJ concluded that Mr. Lukehart could perform jobs existing in significant numbers in the national economy, including the work of a document preparer, final assembler, and stuffer, and therefore is not disabled. Tr. 21-22.

The Social Security Administration's Appeals Council denied Mr. Lukehart's request for review on September 26, 2017. Tr. 1-5. Mr. Lukehart has exhausted his administrative remedies, and now appeals the ALJ's October 2016 decision, which constitutes the final decision of the Commissioner subject to judicial review. Doc. 13, at 3.

## II. **DISCUSSION**

The Court must affirm the Commissioner's denial of social security benefits "if substantial evidence in the record as a whole supports the ALJ's decision." *Milam v. Colvin*, 794 F.3d 978, 983 (8th Cir. 2015). "Substantial evidence is less than a preponderance, but is enough so that a reasonable mind would find it adequate to support the ALJ's conclusion." *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000). The Court must consider both "evidence that detracts from the

Commissioner's decision as well as evidence that supports it." *Id*. (quotation marks and citation omitted). "[A]s long as substantial evidence in the record supports the Commissioner's decision, [the Court] may not reverse it because substantial evidence also exists in the record that would have supported a contrary outcome, or because [the Court] would have decided the case differently." *Andrews v. Colvin*, 791 F.3d 923, 928 (8th Cir. 2015) (quotation marks and citation omitted).

Mr. Lukehart's arguments concern the ALJ's decisions at two different stages of the five-step sequential evaluation. *See* 20 C.F.R. 416.968. First, Mr. Lukehart challenges the ALJ's determination prior to the fourth step regarding his mental RFC. Second, Mr. Lukehart challenges the determination at the fifth and final step of the sequential evaluation process that Mr. Lukehart was not disabled.[1]

### a. Does Substantial Evidence Support the ALJ's RFC as to Mr. Lukehart's Mental Impairments?

Mr. Lukehart argues that the ALJ's finding as to Mr. Lukehart's mental RFC was not supported by substantial evidence.[2]

"The RFC determination must be supported by some medical evidence." *Id.* Nonetheless, the ALJ may formulate the RFC based not only on "medical" evidence, but also on other relevant, credible evidence of record. *Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012) (noting that

---

[1] In the first four steps of the analysis, the ALJ found that (i) Mr. Lukehart was not engaging in substantial gainful activity (Tr. 12, citing 20 C.F.R. 416.971 *et seq.*); (ii) he had a number of medically determinable severe impairments (*id.*, citing 20 C.F.R. 416.920); (iii) his impairments did not meet or medically equal the criteria of certain listed impairments (*id.*, citing 20 C.F.R. 416.920, 416.925, 416.926); and (iv) he had no past relevant work (Tr. 21, citing 20 C.F.R. 416.965).

[2] Mr. Lukehart appears to have abandoned this argument on reply, but the Court nonetheless considers the arguments presented in his opening brief.

3

"[m]edical records, physician observations, and the claimant's subjective statements about his capabilities may be used to support the RFC"). Importantly, "[a]lthough it is the ALJ's responsibility to determine the claimant's RFC, the burden is on the claimant to establish his or her RFC." *Buford v. Colvin*, 824 F.3d 793, 796 (8th Cir. 2016) (citations omitted).

Mr. Lukehart first argues that the ALJ erred in giving no weight to the opinions of Susan Kirkle, APN, RN (Tr. 488), Rebecca Draper-Stuck, LCSW (Tr. 467), and Janet Luzmoor, MAC (Tr. 550). As an initial matter, the ALJ properly noted that these providers were not acceptable medical sources. Tr. 19. The applicable regulations specified that "nurse practitioners" and "licensed clinical social workers" are "medical sources," but not "acceptable medical sources," while "[n]on-medical Sources" include "counselors." SSR 06-03p. Only "acceptable medical sources" could "establish the existence of a medically determinable impairment," provide "medical opinions," and "be considered treating sources . . . whose medical opinions may be entitled to controlling weight." *Id.* (citing, *inter alia*, 20 CFR 416.913(a), 416.927(a)(2), 416.902, 416.927(d)).

The ALJ nonetheless properly noted that the opinions of these providers "may be used to show the severity of the individual's impairments, how it affects the individual's ability to function," and stated that they were "considered with respect to severity and effect on function." Tr. at 19-20. The ALJ found that these three practitioners treated Mr. Lukehart in a "generally conservative" manner, "without escalating modalities," and that "their mental status examinations of the claimant and treatment notes do not support the opined limitations," which were presented "primarily" in standardized, check-the-box forms in which they "failed to provide supporting reasoning or clinical findings . . . ." *Id.*, at 20. The ALJ therefore found their opinions "unpersuasive" and gave them no weight. *Id.* at 19-20.

4

Substantial evidence supports the ALJ's findings with respect to these three providers. Plaintiff had therapy sessions with Ms. Draper-Stuck at intervals of mostly two to six weeks from February 3, 2015 through April 20, 2016. Tr. 465-473, 746-764. Ms. Draper-Stuck routinely described Mr. Lukehart as "shy," "timid," or preferring to stay away "from crowds and people he does not know." Tr. 472, 749, 751, 753, 754, 756, 760, 761. Occasionally, she noted that he was "anxious," "worried," "depress[ed]" or "sad[]" Tr. 749, 751, 754, 761. Once, she noted that Mr. Lukehart reported being angry: "client can become easily frustrated and yell and hit the wall." Tr. 751. Twice, she noted self-reported "crying spells" and "mood swings." Tr. 749, 751. (Those two reports coincided with a report that "Client [wa]s appealing SSI denial." Tr. 751.) Yet, even when Mr. Lukehart claimed "to call peer support groups on a almost daily basis," Ms. Draper-Stuck did not increase the frequency of his therapy sessions or otherwise suggest more aggressive treatment. Tr. 754.

Indeed, throughout the sessions, Ms. Draper-Stuck repeatedly found that Mr. Lukehart "engage[d] well" in therapy. Tr. 472, 473, 747, 754, 755, 759, 761, 763, 764. He was "compliant in keeping his scheduled appointments," albeit with his mother's help. Tr. 473; *see also* Tr. 472. Ms. Draper-Stuck described him as "always polite" as well as "eager to please" and "calm." Tr. 467, 751. He was "well groomed"—though casually dressed, he regularly wore his "hair pulled back and braided." Tr. 753, 471; *see also id.*, at 467 ("Client is dressed in casual manner, hair is long and braided down his back.").

Moreover, Ms. Draper-Stuck's notes repeatedly show that Mr. Lukehart took care of his parents. Tr. 470 ("Client did provide care for his aging Father until Father passed away. . . . Client is good help to his aged mother."); Tr. 751 ("Client is helpful to his aging Mother."); Tr. 758 (noting that "Client will help his Mother cook [Thanksgiving] dinner"). Ms. Draper-Stuck noted

5

that Mr. Lukehart and his mother "have a schedule that they follow each day," which includes routine trips to the library or stores. Tr. 471; *see also* Tr. 764 ("Client and Mother keep a schedule that includes trips to the store and trips to the library."); Tr. 762 ("Client goes to the store with his Mother and to the library."). He would "get[] movies, or books on CD," or "on occasion get[] books that are easy to read." Tr. 467. He participated in rock collecting groups. Tr. 764; *see also* Tr. 763 ("Client is still attending the Geology meeting in St. Joseph, MO."); Tr. 750 ("Client enjoys rock hunting, watching TV."). Moreover, Ms. Draper-Stuck's notes indicate improvement at various points. Tr. 473 (stating that Mr. Lukehart "engages well and is showing some improved personal insight); Tr. 753 ("Client is showing improved insight into his issues."); *see also* Tr. 747 (noting that "client continues to work on improving his overall coping skills").

Ms. Luzmoor's treatment notes, from June 25, 2015 through May 31, 2016, almost exclusively recount events in Mr. Lukehart's life and his feelings about them, as well as goals for treatment (such as improving self-esteem, or expressing anger) and whether and to what degree Mr. Lukehart was meeting them and steps Ms. Luzmoor took or planned to take to help him accomplish those goals. Tr. 555-593. Her treatment plans included self-esteem exercises and encouraging him to express his anger. Tr. 560, 561; *see also* Tr. 564 ("Clinician will continue to listen to Mark empathically and support him to lessen negative self-perceptions."); Tr. 565-66 (noting that homework included direction to Mr. Lukehart to wear brightly colored clothes to therapy sessions and to perform self-esteem building exercises); Tr. 580 ("Clinician will assist Mark with beginning to process his anger on a deeper level, through use of writing exercises."); Tr. 589 ("Clinician will assist Mark with recognizing what is within his control."). She stated that she would encourage him to drive and to attend classes. Tr. 556, 558, 559. Her treatment thus was conservative.

6

Although her notes reflect Mr. Lukehart's self-reported feelings of depression (*see, e.g.,* Tr. 556, 557, 559, 568, 572, 575, 588), and although he once reported having a panic attack when his mother did not pick him up after therapy for ninety minutes (Tr. 561), her notes also show him making strides. The most recent notes, from May 31, 2016, state, "Mark has finally made the step back towards IMR and would likely benefit from continued attendance and socialization there." Tr. 555. Earlier notes similarly indicate progress. *See* Tr. 570 ("Mark appears to be making progress toward being more actively engaged in life again."); Tr. 573 ("Mark was visibly happier and seemed less burdened today."); *id.* ("Mark's medicine changes may be helping his depressive symptoms and sleep patterns."); *see also* Tr. 584 ("Despite his worrying, his mood appeared to be somewhat lighter again this session, following previous medication adjustments."). Ms. Luzmoor's notes also show that Mr. Lukehart worked alongside his family as part of a "conservation team" cleaning up a site by the river (Tr. 564), and he helped with "housework and trips to the store" and cooking family dinner on various occasions. Tr. 567, 572. Ms. Luzmoor noted, "Mark strives to please clinician and his mother. He typically is pleased with himself after completing encouraged tasks." Tr. 557. She also stated that he was "fully cooperative in therapy." Tr. 580; *see also* Tr. 582 ("He was actively engaged and particpative [*sic*]."); Tr. 591 ("He was cooperative throughout the session."). Indeed, in their very first documented session, Ms. Luzmoor observed that "Mark was polite and soft-spoken." None of these descriptions suggest that Mr. Lukehart is more limited than the ALJ concluded.

Similarly, Ms. Kirkle's notes reflect Mr. Lukehart's periodic reports of anxiety, depression, and social isolation, but she always described him as being "[d]ressed appropriately," and having "[n]o problems" with personal cleanliness, having "[l]ogical," "[g]oal-[o]riented" thoughts, "intact" memory, and "[e]uthymic" mood. Tr. 485-86, 515, 606, 628, 636-37, 646-47, 656-57,

7

675, 685, 695, 706, 716-17; *see also* Tr. 631 ("Pt. states he is doing fine with mood and would like to continue current medications. Pt denies depression or mania."); Tr. 680 ("Pt. states his mom has noticed his mood has improved."). He was "calm and cooperative." Tr. 486, 506, 516, 606, 628, 676, 685, 695, 706. Her notes also indicate that Mr. Lukehart was capable of camping and fishing. Tr. 483, 603.

Despite their relatively routine and conservative treatment of Mr. Lukehart, these three providers checked boxes on forms indicating that Mr. Lukehart had marked or even extreme limitations in many areas of mental functioning. For example, both Ms. Draper-Stuck and Ms. Luzmoor found the "polite" and eager-to-please Mr. Lukehart to be "[m]arkedly [l]imited in his "ability to work in coordination with or proximity to others without being distracted by them" and "[e]xtremely [l]imited" in his "ability to complete a normal workday and workweek without interruption from psychologically based symptoms." Tr. 550, 724. Ms. Kirkle found the "logical," "calm and cooperative" Mr. Lukehart to be "[m]arkedly [l]imited" in his "ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes." Tr. 547. She claimed that his ability to remember was "[m]oderately [l]imited," despite the fact that her treatment notes routinely described him as having "intact" memory. Tr. 546. Finally, all three providers found moderate to marked limitations in Mr. Lukehart's ability to maintain a schedule, despite the fact that he participated in scheduled appointments with all three providers without difficulty. Tr. 546, 550, 724.

The providers' check-box forms are not consistent with the contemporaneous treatment notes and conservative course of treatment reflected therein. The ALJ therefore did not err in assigning no weight to their opinions. *See Reece v. Colvin*, 834 F.3d 904, 909 (8th Cir. 2016) (finding that "Commissioner gave good reasons for discounting" treating doctor's opinion where

8

his findings were, *inter alia*, "highly inconsistent with the objective medical evidence in the record" and "other evidence in the record, such as [the claimant]'s activities of daily living and [another doctor's] findings, did not support [the treating doctor]'s opinion and supported a much higher level of functioning than would be expected from someone with the limitations described in [the treating doctor's] Medical Source Statement"); *Toland v. Colvin*, 761 F.3d 931, 935-36 (8th Cir. 2014) (finding that "ALJ had sufficient reason to discount" treating provider's opinion where he "included limitations in the MSS that 'are not reflected in any treatment notes or medical records'") (quotation marks and citation omitted); *Cline v. Colvin*, 771 F.3d 1098, 1104 (8th Cir. 2014) (finding no error in decision to discount "cursory checklist statement" that "include[d] significant impairments and limitations that are absent from [provider's] treatment notes and [claimant's] medical records"); *Anderson v. Astrue*, 696 F.3d 790, 793-94 (8th Cir. 2012) (holding that "a conclusory checkbox form has little evidentiary value when it "cites no medical evidence, and provides little to no elaboration" and that it is proper for ALJ to discount a provider statement that "contained limitations that 'stand alone,' did not exist in the physician's treating notes, and were not corroborated through objective medical testing"); *Buford v. Colvin*, 824 F.3d 793, 797 (8th Cir. 2016) (finding that "conservative treatment [and] management with medication . . . support the ALJ's RFC determination").

The Court does not find Mr. Lukehart's arguments concerning the timing of the opinion rendered by Joan Singer, PhD, persuasive. Although Dr. Singer's opinion was provided on July 16, 2015 (Tr. 140), one year prior to the administrative hearing, it was rendered after the date of Plaintiff's alleged disability onset of April 7, 2015 (Tr. 136). The timing alone is not a basis for discounting Dr. Singer's opinion. *See Chandler v. Comm'r of Soc. Sec.,* 667 F.3d 356, 361 (3d Cir. 2011) (noting that "there is always some time lapse between the consultant's report and the

9

ALJ hearing and decision" and that "[t]he Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it" and permitting reliance on records that were "a few years old"). Nor is the fact that "Dr. Singer's opinion was rendered without the benefit of much of Nurse Kirkle or Ms. Draper-Stuck's treatment notes and without any of Ms. Luzmoor's treatment [notes] or the three medical source statements completed by each of these providers" (Doc. 8, at 27-28) a basis for reversal. As discussed above, the ALJ properly discounted those providers' notes and statements, so the consulting expert's failure to consider them cannot constitute reversible error. *See Casey v. Astrue*, 503 F.3d 687, 694 (8th Cir. 2007) ("Our review of the record shows that [the consulting expert's] October 23, 2002, report was consistent with the medical evidence as of that date. The later reports of [treating providers] were not entitled to significant weight, as we discussed above. The ALJ did not err in considering the opinion of [the consulting expert] along with the medical evidence as a whole.") In any event, Dr. Singer was not required to update her opinion when new treatment records became available. *See Hollis v. Colvin*, 15-03064-CV-S-ODS, 2015 WL 7444632, at *2 (W.D. Mo. Nov. 23, 2015) ("Plaintiff does not provide, and the Court is not aware of, any legal authority which holds a consultant's medical opinion must be based on subsequently created medical records, or that the consultant's opinion necessarily must be discounted because it is not based on those records.").

The ALJ was entitled to rely on Dr. Singer's opinion in determining Mr. Lukehart's RFC. *Casey v. Astrue*, 503 F.3d 687, 694 (8th Cir. 2007) ("It is well settled that an ALJ may consider the opinion of an independent medical advisor as one factor in determining the nature and severity of a claimant's impairment.") (quotation marks and citation omitted). Unlike the check-the-box opinions of Ms. Draper-Stuck, Ms. Luzmoor, and Ms. Kirkle, Dr. Singer's narrative opinions were consistent with other evidence in the record, including information shown in the treatment notes,

10

as well as Mr. Lukehart's reported activities. Tr. 140; *see also* Tr. 146 ("Despite his allegations, his memory has been intact and he is able to go into social settings despite his agoraphobia. Claimant is still able to do very simple repetitive work with limited social interaction.").

The ALJ's RFC with respect to Mr. Lukehart's mental impairments—which limited him "to simple, routine work," without any "interaction with the public" and "no more than occasional interaction with co-workers and supervisors"—thus was supported by substantial evidence.

### b. **Whether There Was Substantial Evidence that Mr. Lukehart Can Perform the Duties of a Document Preparer, Final Assembler, or Stuffer**

At the fifth stage of the sequential evaluation process, the Commissioner bears the burden of proving "first, that the claimant retains the residual functional capacity to perform other kinds of work, and, second, that other such work exists in substantial numbers in the national economy." *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000). Mr. Lukehart argues that substantial evidence does not support the ALJ's determination at the fifth stage, because there was not proof that the limitation on overhead reaching in the RFC was compatible with the representative jobs the VE identified.

The ALJ found that Mr. Lukehart could "no more than occasionally reach overhead bilaterally." Tr. 14. The VE testified that, despite this limitation, Mr. Lukehart could work as a document preparer, final assembler, or stuffer. Tr. 113-14. Yet, the Dictionary of Occupational Titles ("DOT") describes each of these positions as requiring "[f]requent[]" reaching—"from 1/3 to 2/3 of the time." DOT 249.587-018, 1991 WL 673099 (4th Ed. Rev. 1991); DOT 713.687-018, 1991 WL 679271; DOT 731.685-014, 1991 WL 679811. The Social Security Administration's Program Operations Manual System's Medical and Vocational Quick Reference Guide (the "Program Operations Manual") defines "[r]eaching" as "[e]xtending the hands and arms in any direction." DI 25001.001(A)(63) (available at

11

https://secure.ssa.gov/apps10/poms.nsf/lnx/0425001001). Thus, it is not clear from the DOT or the Program Operations Manual whether any of the three positions identified by the VE requires overhead reaching.

The Eighth Circuit requires that the ALJ "ask about any possible conflict between VE evidence and information provided in the DOT." *Moore v. Colvin*, 769 F.3d 987, 989 (8th Cir. 2014) (quotation marks and citation omitted). The relevant portion of the proceeding here unfolded as follows:

> Q      Is your testimony consistent with the DOT?
>
> A      Yes.
>
> Q      Assume further that this individual should only occasionally reach overhead bilaterally. Would such a person be able to perform any of those three jobs that you've described?
>
> A      Yes. They would be able to do all of them.
>
> ALJ:    Okay.

*Id.* Thus, the ALJ did ask the vocational expert whether her testimony was consistent with the DOT, and the vocational expert responded that it was, but this was just *before* the ALJ asked whether a person who could "only occasionally reach overhead bilaterally" could perform one of the three jobs. Tr. 114. After this exchange, the ALJ ceased asking the vocational expert questions, and no one elicited further testimony from the vocational expert on this subject. *See id.* Thus, neither the ALJ nor the VE addressed the conflict between the limitation on overhead reaching and the "frequent[]" reaching that the three referenced jobs, as described in the DOT, require.

Defendant argues that the fact that the ALJ asked about overhead reaching immediately after inquiring about consistency with the DOT demonstrates that consistency with the DOT was "fresh in the mind of the vocational expert" and that "she saw no discrepancy between that limitation and the descriptions of those jobs, specifically with regard to overhead reaching . . . ."

12

Doc. 13, at 17. But given that the burden at the fifth stage of the evaluation process was on the Commissioner, and not the claimant, it would be inappropriate for the Court to draw this inference in favor of the Commissioner.

Defendant also argues that there was no real conflict between the VE's testimony and the DOT, citing two district court cases that found no actual conflict between DOT descriptions and a claimant's RFC. However, those cases are distinguishable. In *Seals v. Colvin*, No. 14-302, 2015 WL 8967789, at *2 (E.D. Ark. 2015), the claimant's ability to reach was limited in one arm only, so there was not necessarily a conflict between the DOT description and the claimant's limitation. In *Latragna v. Colvin*, No. 14-496, 2015 WL 4771630, at *18 (E.D. Mo. 2015), there was no limitation on reaching at all, but rather, limitations concerning simplicity of instructions, which presented only a "*possible*" conflict with the reading requirements described in the DOT. These cases thus are not relevant here, where the claimant's ability to reach overhead has been found to be limited bilaterally, and the identified jobs require frequent reaching in unspecified directions.

It may be, as Defendant argues, that the jobs of document preparer, final assembler, and stuffer do not require any overhead reaching at all. But without an explanation in the record for the apparent discrepancy between the DOT and the VE's testimony, there is not sufficient evidence in the record to support the ALJ's conclusion that Mr. Lukehart could perform the three identified jobs despite the overhead-reaching limitation. *See Moore*, 769 F.3d at 990 ("Absent adequate rebuttal, . . . VE testimony that conflicts with the DOT 'does not constitute substantial evidence upon which the Commissioner may rely to meet the burden of proving the existence of other jobs in the economy a claimant can perform.'") (citation omitted).

Given that nothing in the record indicates that the ALJ or the vocational expert recognized, let alone explained, the conflict between the vocational expert's testimony that one who could

reach overhead only occasionally could nonetheless perform the three jobs and the DOT listings stating that each job involves "frequent[]" reaching, the Court must conclude that the Commissioner failed to meet her burden of proving that Mr. Lukehart was not disabled at step five of the sequential evaluation process. *See Kemp ex rel. Kemp v. Colvin*, 743 F.3d 630, 633 (8th Cir. 2014) ("[T]he record does not reflect whether the VE or the ALJ even recognized the possible conflict between the hypothetical describing a claimant who could reach overhead only occasionally, and DOT job listing . . . indicating that a check-weigher job involved constant reaching. Further, the VE did not explain the possible conflict and the ALJ sought no such explanation. Thus, the Commissioner did not meet her burden, at step five of the sequential evaluation process, of establishing that jobs existed in the economy that Charles was capable of performing."); *Moore*, 769 F.3d at 990 ("We conclude that the modifier 'clearing tables,' without more, was not sufficient to satisfy the question of whether or not the job of a cafeteria attendant requires more than occasional overhead reaching and that the ALJ improperly relied on the testimony of the VE without resolving this apparent conflict. Accordingly, the Commissioner failed to meet her burden of proving that Moore was not disabled in step five of the sequential evaluation process.").

### III. CONCLUSION

For the reasons discussed above, the Commissioner's determination is AFFIRMED in part and REVERSED in part, and the case is REMANDED for further consideration, consistent with this order.

s/ Nanette K. Laughrey  
NANETTE K. LAUGHREY  
United States District Judge

Dated: August 6, 2018  
Jefferson City, Missouri